IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| JERRY M. PORTER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 05-0867-CV-W-ODS |
| ) | |
| JO ANNE B. BARNHART, ) | |
| Commissioner of Social Security ) | |
| ) | |
| Defendant. ) | |

**ORDER AND OPINION AFFIRMING
COMMISSIONER'S FINAL DECISION DENYING BENEFITS**

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying his application for disability benefits. The Commissioner's decision is affirmed.

I. BACKGROUND

Plaintiff was born in August 1947, received a high school diploma, and completed a few college classes. He last worked as a school bus driver in August 2002, a job he held for approximately six years. For the preceding twenty years, Plaintiff worked as a skip tracer. Plaintiff applied for benefits in March 2003, claiming he became disabled on August 16, 2002 (the last day he worked).

Dr. William Whitley began treating Plaintiff in the early 1970s, primarily for complaints of back pain. The earliest records from Dr. Whitley are from mid-December 2001, and are noteworthy because they reflect Plaintiff always refused to be weighed and usually refused to allow his vital signs to be measured and recorded. On April 1, 2002, Plaintiff was diagnosed as suffering from diabetes and was treated (at least initially) with instructions to modify his diet and monitor his sugar levels. R. at 120. By October 2002, insulin was being prescribed as well. R. at 119. In December 2002, Dr. Whitley wrote a letter on Plaintiff's behalf declaring he had been treating Plaintiff for the

last thirty years due to varying degrees of low back pain and that these episodes were likely to continue into the future. He repeated Plaintiff's report the injury was sustained while in the military, but cautioned that he had no direct knowledge of the source of Plaintiff's injury. R. at 116.

In addition to seeing Dr. Whitley regularly for back pain, Plaintiff sought treatment for some matters (e.g., flu shots) at the VA Hospital. However, on August 22, 2002, Plaintiff went the VA Hospital complaining of a constant, throbbing pain in his back and lower extremities he attributed to his military service. He was referred to his primary care provider. R. at 179. On October 21, Plaintiff received his annual flu shot; at that time, the treatment note indicates Plaintiff "has a negative screen for depression." R. at 178. He returned one week later seeking an evaluation for post-traumatic stress disorder ("PTSD"), reporting he was experiencing visions or flashbacks from an incident during army training where "a cook ran his truck into [Plaintiff's] group, killing the [sergeant] and injuring several others." He also reported he was "let go" from his job as a school bus driver in May.[1] R. at 175. Plaintiff was directed to the PTSD Clinic, but it does not appear Plaintiff visited the clinic prior to February 2003.

On January 24, 2003, Plaintiff went to the VA Hospital complaining of pain and lesions on his hands. He was prescribed an antibiotic and told to administer ice. R. at 174. The next day, Plaintiff went to the emergency room at St. Mary's Hospital, complaining of hives and nausea. He was prescribed Zantac, Benadryl, and intravenous fluids. R. at 99-100. Plaintiff returned to St. Mary's the next day after becoming confused and "decreased mental status." He was admitted to the intensive care unit ("ICU") for observation and tests. R. at 97-98. It was determined Plaintiff was suffering from an allergic reaction to the antibiotic prescribed at the VA Hospital that caused, *inter alia,* acute renal failure. R. at 92-94. Further testing was done to determine the precise etiology of the renal failure; it was finally determined he suffered from rhabdomyolysis, which "is the breakdown of muscle fibers resulting in the release

---

[1] The conflict between this statement and the remaining evidence in the Record indicating Plaintiff worked until August 2002 is not explained.

of muscle fiber contents into the circulation. Some of these are toxic to the kidney and frequently result in kidney damage."[2] He was treated for this condition, then discharged on January 30. R. at 82-83. He followed up with a visit to a rheumatologist on February 13, at which time the renal problems and rhabdomyolysis were described as "resolved." R. at 188.

On February 10, 2003, Plaintiff went to the PTSD clinic at the VA Hospital. He reported having served in the infantry during the Vietnam war, but his service record reflects that he was a personnel specialist. Plaintiff explained this discrepancy by declaring he had been told his records were burned. He also indicated he was involved in an operation called "Garden Plot," but refused to share much information. R. at 169. On February 20, Plaintiff met with a staff psychiatrist (Teresa Moscovich). He "brought a hand written [sic] document about his different experience[s] in the military and refused to talk about it." Plaintiff was reluctant to talk and became tearful when he tried to discuss his nightmares; however, the psychiatrist noted his "thoughts are clear; speech slow goal directed and coherent." She determined Plaintiff "may need an antidepressant but he is not stable medically, has recent changes in his medical condition," and recommended Plaintiff return in four to six weeks. R. at 170.

Plaintiff returned for a psychological evaluation (conducted by Janet Corber) on March 6, 2003. Plaintiff "appeared significantly depressed" but was "'feeling better' in terms of recent medical problems." He related that he was in the infantry and reiterated he supposed to be deployed as part of "Operation Garden Plot," but refused to talk further about it because he had been ordered not to. The evaluator, however, had access to information about Operation Garden Plot and described it as "civil defense control operations first developed in the late 1960s calling for the direct support of civil disturbance control operations by the Army, USAF, Navy, and Marine Corp." Plaintiff's service record provides some contradiction, as it indicates Plaintiff was a "personnel specialist" and not an infantryman. Regardless, Plaintiff admitted he was never under

---

[2]This information was found on a website maintained by the U.S. National Library of Medicine and the National Institutes of Health. http://www.nlm.nih.gov/medlineplus/ency/article/000473.htm (last visited Aug. 24, 2006).

fire (friendly or hostile), not wounded during or even exposed to combat, did not witness or participate in atrocities, was not sent overseas, and never left Colorado. Plaintiff "declined to talk about military-related trauma [but] provided a handwritten report of stressors which he had submitted in support of his disability claim for PTSD." The three stressors Plaintiff listed were (1) witnessing an automobile accident involving his unit, (2) learning about the death of a friend, who was killed during combat, and (3) the death of a friend who was killed during a "civilian auto accident in Iowa while on leave." Plaintiff denied experiencing hallucinations but complained of nightmares (which he would not describe) and difficulty concentrating. The analyst concluded Plaintiff's reported symptoms met the "criteria for depression and some criteria for posttraumatic stress disorder. The veteran's report of his military experiences does not clearly establish the existence of a traumatic event which evoked 'intense fear, helplessness, or horror.'" Testing and therapy were recommended. R. at 163-67.

On May 8, 2003, Plaintiff underwent a consultative exam conducted by Dr. Joe Pryor. Plaintiff indicated "that he was injured by shrapnel in the left leg, the nose and the right arm in Vietnam." After examining and testing Plaintiff, Dr. Pryor indicated Plaintiff's long-term maladies included pain and limitation of motion in his left shoulder due to rotator cuff tendinitis and adhesive capsulitis, possible degenerative disease in the hip and lower back (which would require x-rays to confirm), hypertension, diabetes, and an intermittent, chronic rash. Based on what he could ascertain without x-rays, Dr. Pryor opined Plaintiff could lift no more than fifteen pounds and stand or walk for thirty minutes at a time and no more than six hours a day. No limitations were placed on his ability to sit. R. at 190-93.

On June 30, 2003, Plaintiff went to St. Luke's Hospital for pulmonary function testing and was assessed with severe obstructive airway disease that responded well to treatment. R. at 194. In December, Plaintiff began receiving prescriptions for Albuterol from Dr. Whitley. On April 13, 2004, Dr. Whitley wrote a letter on Plaintiff's behalf opining Plaintiff was "completely and totally disabled from any and all remunerative occupational activity and will remain so both in the near and distant future . . . ." He explained Plaintiff suffered from chronic obstructive pulmonary disease that left him

4

unable to stand for more than ten minutes at a time, walk for more than two or three minutes at a time, needed to "rest frequently and requires oxygen at regular consistent intervals." Dr. Whitley also detailed Plaintiff's allergic reaction in January 2003 and, while admitting the acute renal failure was resolved, indicated the incident left Plaintiff with "1). altered cardiac function, 2). altered lung function, 3). altered renal function, and 4). . . .compromised circulatory function . . . ."

Approximately two weeks later, Plaintiff returned to the VA Hospital complaining of low back pain and difficulty breathing. At the time he weighed 340 pounds and was deemed to be overweight. His lungs were clear and his oxygen saturation rate was 96%. R. at 231-32.

On August 23, 2004, Plaintiff went to the VA Hospital for a psychological evaluation. He told the psychologist (Dr. Cynthia Piedimonte) he had been trained as a sniper and while in Vietnam he was with a superior officer who had trained him when his comrade was shot; Plaintiff responded by shooting several enemy soldiers. The trainer died in the hospital from blood loss and "the military told his family he died in a car accident 6 months later and they sealed the casket so that it could not be opened." Plaintiff also reported experiencing "heavy combat conditions" and witnessing "numerous traumatic deaths and injuries " and "numerous maimed, mutilated, burned bodies." R. at 229. A follow-up appointment was scheduled for mid-September to complete the assessment (because Plaintiff had arrived late to his appointment), but Plaintiff did not show up at that time. He next saw Dr. Piedimonte in early or mid November. R. at 223. Based on Plaintiff's report, Dr. Piedimonte concluded Plaintiff suffered from PTSD and recommended counseling. R. at 223-28.

Plaintiff testified he stopped working in August 2002 due to injuries he suffered in the service. When asked to describe his injuries, he explained he injured his legs and right forearm when he was hit by shrapnel "[f]rom a high impact explosion" and consequently continued to experience pain in those areas as well as his head, shoulders and back. R. at 255-57. He also felt lethargic and had difficulties concentrating. He estimated he could walk only twenty to thirty yards before needing to rest, could stand for only ten to fifteen minutes, and sit for around an hour. R. at 262-

63. Plaintiff's wife testified similarly to Plaintiff, adding his concentration difficulties developed after his January 2003 hospitalization.

Testimony was solicited from a medical expert, Dr. Selbert Chernoff, who had reviewed Plaintiff's medical records but had not examined Plaintiff. In describing the contents of Plaintiff's medical records, Dr. Chernoff testified Plaintiff suffered from diabetes and hypertension, but both conditions were controlled with diet and medication (or, at least, treated as well as could be expected given Plaintiff's weight). Plaintiff suffered rhabdomyolysis and acute renal failure in January 2003, but those conditions were short-lived and did not result in any lasting complications. Plaintiff suffers from obstructive airway disease, Plaintiff's oxygen saturation remained steady during a four-minute treadmill test, so Plaintiff was minimally limited by this condition. Dr. Chernoff noted there were absolutely no records – including x-rays – documenting either war wounds or back problems, either from the VA or from Dr. Whitley. Problems with concentration or psychological problems were not documented. He concluded that, based on the medical records, Plaintiff should be able to sit and stand six hours in an eight-hour day and lift ten pounds frequently and twenty pounds occasionally. R. at 272-79.

A Vocational Expert ("VE") also testified. He described Plaintiff's past job of skip tracer as sedentary, semi-skilled, and his past job of bus driver as light, semi-skilled. When asked to assume a person of Plaintiff's age, education and experience who suffered from controlled diabetes and hypertension, mild hearing loss, and back pain that left him able to stand one hour at a time and six hours per day and sit two hours at a time and six hours per day, the VE testified such an individual could return to both of his prior jobs. When asked to assume the individual was so preoccupied with his physical condition that he would lose focus on his tasks for two three hours per day, the VE testified such an individual could not perform any work. R. at 287-89.

The ALJ found Plaintiff to be only partially credible. Plaintiff attributed the ailments he identified as significant during the hearing to injuries suffered during combat, but Plaintiff had worked for a very long time after the Vietnam War. He discounted Dr. Whitley's opinions because they were unsupported by clinical findings of

any sort, including x-rays. The Record reflected no long-term effects from Plaintiff's allergic reaction and kidney problems in January 2003, and also did not reflect any complaints of side-effects from medication. Plaintiff did not testify to engaging in significant activities, but all doctors noted he was obese (a particularly important fact, given his diabetes), and Dr. Whitley had advised Plaintiff to exercise. Based on his findings and the VE's testimony, the ALJ concluded Plaintiff retained the residual functional capacity to return to his prior work.

## II. DISCUSSION

Plaintiff's sole argument is the ALJ's decision – including particularly his credibility determination – was not supported by substantial evidence in the record as a whole. "[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

The familiar standard for analyzing a claimant's subjective complaints of pain is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the
> disability results from a medically determinable physical or
> mental impairment, direct medical evidence of the cause and

7

> effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. The claimant's daily activities;
> 2. the duration, frequency and intensity of the pain
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

739 F.2d at 1322.

Beyond setting forth the standard of review, Plaintiff has not really provided a meaningful argument for the Court's consideration. Nonetheless, the Court has conducted an independent review of the matter and concludes the Commissioner's final decision was supported by substantial evidence in the record as a whole. Many of Plaintiff's maladies are treatable (or have been treated) and do not limit Plaintiff's functional capacity. Chief among these are Plaintiff's diabetes, hypertension, renal failure, and rhabdomyolysis. Other conditions are not documented, or are not documented well enough to play a meaningful role in the analysis; for instance, Plaintiff's back, hip, and leg pain (due to the lack of diagnostic tests and the dubious origin of his maladies) and PTSD (again, due to the questionable origin for the alleged malady). Plaintiff's differing statements, particularly to the staff at the VA PTSD clinic,

8

provide a legitimate basis for doubting Plaintiff is completely accurate. Dr. Whitley's notes offered in support of Plaintiff's disability claim do not make a lot of sense, are unsupported by medical evidence, and include opinions beyond the scope of a doctor (e.g., his opinion that Plaintiff cannot work). Moreover, Dr. Whitley has reported Plaintiff's need to lose weight and to that end has advised him to exercise – a recommendation completely inconsistent with his beliefs about Plaintiff's limitations.

## III. CONCLUSION

The Commissioner's final decision denying benefits is affirmed.
IT IS SO ORDERED.

DATE: September 5, 2006

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
UNITED STATES DISTRICT COURT

9